## MOUNT v. NORFOLK SAVINGS & LOAN CORP.

### No. 6264.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 2, 1951.

Decided Nov. 5, 1951.

Israel Steingold, Richmond, Va. (Samuel A. Steingold and Steingold & Steingold, all of Norfolk, Va., on the brief), for appellant.

Henry J. Lankford, Norfolk, Va., for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The trustee in bankruptcy of Legum Furniture Corporation brought this suit against Norfolk Savings and Loan Corporation, hereinafter called the bank, to set aside and avoid the assignment of certain conditional sales contracts pledged by Legum with the bank as collateral security for loans, and to recover, as voidable preferences under Section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96, certain moneys collected by the bank on assigned contracts. The District Judge gave judgment for the bank and dismissed both claims of the trustee.

Legum was engaged in the retail sale of furniture in Norfolk, Virginia, under conditional sales contracts whereby the purchaser, having made an initial payment, was given possession of the goods, and agreed to pay the balance of the purchase price in monthly installments, and the seller retained title to the goods pending full payment with the right in case of default to repossess them. The contracts were valid and were duly docketed under the Virginia statutes. See Section 55–88 of the Virginia Code of 1950.

A petition in involuntary bankruptcy was filed in the District Court against Legum on May 3, 1950 and was followed by an adjudication on May 16, 1950. The bankruptcy schedule showed assets of $42,638.-02 and liabilities of $125,115.63. The trustee collected accounts receivable in the amount of $1600.95 and sold the remaining assets for $11,300. At the time of bankruptcy the bank held assigned accounts in the sum of $17,992.06. At the time of the hearing in the District Court it had collected $6206.95 on the accounts assigned to it and held assigned accounts of the face value of $11,785.11. Its claim at the time of bankruptcy amounted to $15,416.

For six or seven years prior to bankruptcy Legum had been borrowing money from the bank on promissory notes payable in monthly or weekly installments, and had assigned, as collateral security, conditional sales contracts of its customers. The con-

tracts were docketed as required by the state statute, and were then assigned by endorsement and delivered to the bank. Assignments were also stamped on the customers' accounts on the Legum ledger. There was no other written agreement between the parties defining the procedure for the collection, control and distribution of the proceeds of the accounts; and the agreement in these respects can be ascertained only from the oral testimony of the officers of the participating corporations as to their understanding, and particularly from what was actually done in carrying on the business.

The procedure may be described as follows: When Legum borrowed money from the bank it gave a promissory note for the amount of the loan payable in installments and assigned and delivered sales contracts to the bank in such an amount that the average weekly payments due on the contracts approximated the amount of the installment payments due on the note. The purchasers were not notified of the assignment of the accounts but the understanding was that Legum was to make the collections and to remit to the bank the amount of the installments due on its promissory note. If the amount collected was more than the installments due on the note Legum kept the balance and used it in its business; and if the amount was less Legum was expected to make up the deficiency. There was no specific agreement that Legum should make the collections and remit the proceeds to the bank; and in fact the moneys collected were not remitted to the bank; but the executive officers of both lender and borrower in charge of the transactions testified that Legum collected the accounts as agent of the bank.

There was no attempt by Legum to segregate its collections on the assigned accounts, which constituted about 25 per cent of all of its accounts, from its collections on other accounts. All collections were deposited by Legum in a national bank of deposit and used in Legum's business. The bank exercised no control over the collections and required no accounting thereof. The judge found that it "was interested in these collections, and showed interest in the collections, only so far as it was necessary to obtain from the bankrupt the money sufficient to meet its obligations at the bank."

Legum did not report to the bank the collections on assigned accounts as they were made, or assign new accounts to the bank to take the place of those which were paid at the time that they were closed out. Usually Legum's representative brought new accounts to the bank, especially when Legum desired to renew a note, and on these occasions the bank's agent would go to Legum and check the accounts on the ledger to ascertain whether the open accounts were sufficient in amount to secure the loans. There was no regularity about the procedure and no attempt on Legum's part to segregate or hold the collections for the bank until such time as new accounts of equal amount were assigned.

Legum repossessed purchased goods from delinquent customers and resold the goods whenever it saw fit to do so without notice to the bank. There is no evidence that it ever became necessary to bring suit against a defaulting customer on an assigned contract in the hands of the bank or to make use of the document to repossess the goods which it covered. Legum was supposed to substitute a new contract for repossessed goods but the substitutions for such accounts were made at irregular intervals in the same manner as substitutions for accounts closed by payment.

The course of events during the year preceding bankruptcy gives evidence of the control and use of the moneys collected on the assigned accounts which Legum exercised with the bank's consent. During this period Legum was continuously in default in its payments to the bank and continuously used the proceeds of the accounts in its business. For example, on September 16, 1948 Legum gave its collateral note to the bank for $3000 payable in installments of $300 per month; but the payments were not made as agreed, and on January 6, 1950 the note was renewed for $1050.

On January 8, 1949 Legum gave its collateral note for $2500 payable in monthly installments of $500; but the only payment was $1000 on April 20, 1949 and

thereafter nothing was paid but interest in the sum of $100 on September 15, 1949 and $31.75 on January 21, 1950.

On April 8, 1949 Legum gave a collateral renewal note for $11,263 payable in weekly installments of $225, but paid thereon only $450 on June 29, 1949 and $216 as interest on September 3, 1949.

On December 12, 1949 the last mentioned note was renewed for $11,663, payable in like manner, but only $450 was paid thereon on February 10, 1950 with interest in the sum of $83 on March 6, 1950. When this note was given Legum owed the bank $16,123, which was secured by assigned accounts in the sum of $13,679.26. A condition of the renewal was the promise of Legum to assign additional accounts as collateral, and accordingly accounts in the sum of $4312.50 for goods sold in January, 1950 were assigned to the bank in February, 1950.

The District Judge found that there was no evidence to show that in February, 1950, within four months of bankruptcy, the bank had reasonable cause to believe that Legum was insolvent. It is, however, established by the evidence that in the latter part of March or the early part of April, 1950 Legum was called to account by the bank for his delinquencies on the notes, and informed the bank that it was unable to meet its obligations, and agreed with the bank that it should notify the purchasers to make their payments direct to it. The notice was given on April 10, 1950 and thereby the bank for the first time assumed control of the collection and disposition of the proceeds of the accounts. Whatever may have been the knowledge of the bank in February, 1950, there is no doubt that it had positive knowledge of Legum's insolvency before it received any part of the collections which it subsequently made.

From this recital it is obvious that the transactions between the parties may be summed up in the statement that the bank obtained and held in its possession assignments of contracts in an amount usually but not always sufficient to cover Legum's indebtedness, and in form adequate to convey legal title to the accounts; that Legum collected and retained the proceeds of the accounts and used them at will in the course of its business with the knowledge of the bank; but that new accounts were not substituted for old when the latter were closed by payment or repossession, but from time to time the bank inspected the assigned accounts and obtained new accounts in place of those which were in default or had been paid off. The question for decision is whether the bank acquired good title to the assigned accounts in these circumstances under the law of Virginia because the rights of the parties depend primarily upon the law of that state.

It is a principle of law in effect in Virginia and in certain other jurisdictions that a transfer of property as security which reserves to the transferor the right to dispose of the same or to apply the proceeds thereof for his own uses is fraudulent in law and void as to creditors. The rule "rests not upon seeming ownership because of possession retained, but upon a lack of ownership because of dominion reserved. It does not raise a presumption of fraud. It imputes fraud conclusively because of the reservation of dominion inconsistent with the effective disposition of title and creation of a lien." Benedict v. Ratner, 268 U.S. 353, 363, 45 S.Ct. 566, 569, 69 L. Ed. 991. See also Mathews v. Bond, 146 Va. 158, 135 S.E. 689; Didier v. Patterson, 93 Va. 534, 25 S.E. 661; In re Spanish-American Cork Products Co., 4 Cir., 2 F.2d 203. In Mathews v. Bond, 146 Va. 158, 163–164, 135 S.E. 689, 691, the court said: "This court, in a long line of cases, has consistently held that a deed of trust executed by a debt or for the purpose of indemnifying certain named creditors, which reserves to the grantor a power of control and disposition inconsistent with the avowed purposes of the trust and adequate to defeat such purposes, is, by reason of such reservation, *per se* fraudulent and void as to creditors thereby postponed."[1]

---

1. The deed of trust or mortgage is void whether reservation of control in the grantor is contained on the face of the instrument, Gray v. Atlantic Trust & Deposit Co., 113 Va. 580, 75 S.E. 226; or is subsequently acquiesced or consented

■ Valid transfers of open accounts as collateral security may nevertheless be made even in the absence of statute. In Virginia they are expressly authorized by Section 11-5 of the Virginia Code of 1950 which provides: *"Assignment of accounts receivable, etc., without notice to debtor.— All written assignments made in good faith, whether in the nature of a sale, pledge or otherwise, of accounts receivable and amounts due or to become due on open accounts or contracts shall be valid, legal and complete, and shall be deemed to have been fully perfected, without notice to the debtor of such assignment. Such assignments shall take effect according to their terms and be valid and enforceable, as of the respective dates thereof, against all persons whomsoever and in any event."*

It does not follow, however, that an assignment of accounts is good and enforceable in the hands of the assignee because it is cast in a form recognized as sufficient to convey title by statute or by the decisions of the courts; for the rights of the parties are to be determined by what they actually do rather than by the provisions of a contract which they disregard in giving effect to the transaction. See Grimes v. Clark, 4 Cir., 234 F. 604, 607; In re Almond-Jones Co., D.C.Md., 13 F.2d 152, affirmed Union Trust Co. v. Peck, 4 Cir., 16 F.2d 986. Thus in the first case a provision in a chattel mortgage that the assignor might sell the mortgaged property as agent of the assignee and account to the assignee for the money received was held insufficient to save the assignment, because the obligation to account was disregarded with the consent of the assignee; and in the second case an assignment of open accounts was declared invalid as against the trustee in bankruptcy, although under the agreement the customers' checks were deposited in the lending bank with the right on its part to apply the proceeds in reduction of the loan because the bank never exercised the right but permitted the assignee to use the money in its business. The opposite conclusion was reached in Chapman v. Emerson, 4 Cir., 8 F.2d 353, described by the court as a close case, where the proceeds of the accounts were under the control of an individual who was an executive officer of both the lenders and the bankrupt corporation.

It is, however, urged that the decisions show that assignments of open accounts are deemed valid even though the assignor collects the money and repossesses goods from defaulting customers, if the parties agree that new accounts shall be substituted for those that are closed, and this agreement is carried into effect. It will be found, however, that the determination as to whether a case falls on one or the other side of the line depends upon the extent to which the parties intended that the borrower should keep or relinquish control of the proceeds of the accounts and the extent to which the right of the assignee to control the collateral has been enforced or abandoned. See Lindsay v. Rickenbacker, 5 Cir., 116 F.2d 29; In re Pusey, Maynes, Breish Co., 3 Cir., 122 F.2d 606; In re Bernard & Katz, 2 Cir., 38 F.2d 40; Lee v. State Bank & Trust Co., 2 Cir., 38 F.2d 45; Parker v. Meyer, 4 Cir., 37 F.2d 556, 557.[2]

■ In the pending case it is clear that Legum's control of the accounts assigned

to in the actual performance of the arrangement, Boice v. Finance & Guaranty Corp., 127 Va. 563, 102 S.E. 591, 10 A.L.R. 654; accord, United States v. Lankford, D.C.E.D.Va., 3 F.2d 52. "A conveyance under which any pecuniary benefit is reserved by the debtor" is fraudulent and void. Didier v. Patterson, 93 Va. 534, 538, 25 S.E. 661, 662.

2. Thus In re Bernard & Katz, 2 Cir., 38 F.2d 40, 44, it was held that a lender to whom accounts had been assigned as collateral was entitled to assert his lien against repossessed goods in the hands of the borrower because the evidence showed that the borrower was permitted to use the returned goods upon the condition, which was performed, that he substitute new accounts therefor, and hold the returned merchandise in trust until the substitution was made; but in Lee v. State Bank & Trust Co., 2 Cir., 38 F.2d 45, where the collateral agreement also provided that in the event of the return of merchandise it should be held by the borrower in trust for the lender, the lien was lost because in practice the returned goods were taken back without consultation with the lender and freely sold as the property of the borrower without the substitution of new accounts therefor.

as collateral was substantially unrestricted and free. The occasional inspection of its ledgers and the occasional substitution of new accounts for old ones did not materially affect the situation, since each substitution merely replaced one invalid assignment by another equally defective without interfering with the free use by Legum of the moneys collected and the goods returned. Nor was the situation altered by the physical retention by the bank of the assigned contracts, for that circumstance could not interfere with Legum's control over collections or repossession except in case of suit, and actually did not interfere at all with Legum's operations.

See also, D.C., 10 F.R.D. 504.

The judgment of the District Court is reversed with directions to enter judgment setting aside the assignments of the uncollected accounts to the bank in favor of the trustee in bankruptcy and directing the bank to pay to the trustee the moneys collected on the assigned accounts since April 10, 1950.

Reversed and remanded.

Similarly, assignments of accounts, where substitutions were allowed, were held valid in Lindsay v. Rickenbacker, 5 Cir., 116 F.2d 29, and In re Pusey, Maynes, Breish Co., 3 Cir., 122 F.2d 606, because the collections were held until the substitutions were made; but in Re Almond-Jones Co., D.C.Md., 13 F.2d 152, the assignments were held invalid because the assignee allowed the assignor to use the collections at will.

In Mathews v. Bond, 146 Va. 158, 135 S.E. 689, upon which the bank in the instant case relies, the validity of a mortgage on personal property was upheld by sustaining a demurrer to a complaint which showed that the borrower was permitted to sell the goods pledged as security but was obliged to account each month for the proceeds of the sale and the proceeds were carefully guarded by a provision that a specific portion of the proceeds was to be paid monthly to the lender and applied to the liquidation of the debt. There was nothing to show breach of this provision.